BASCHAB, Presiding Judge.
The appellant, Jason Michael Sharp, was convicted of capital murder for the killing of Tracy Lynn Morris. The murder was made capital because he committed it during the course of a rape or an attempted rape, a violation of § 13A-5-40(a)(8), Ala. Code 1975. After a sentencing hearing, by a vote of 11-1, the jury recommended that he be sentenced to death. The trial court accepted the jury’s recommendation and sentenced him to death. The appellant filed a motion for a new trial, which was denied by operation of law. See Rule 24.4, Ala. R.Crim. P. This appeal followed.
The appellant raises several arguments on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
“[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
The following dates and events are relevant to an understanding of some of the issues the appellant raises in his brief to this court:
January 2,1999 The offense occurred.
January 15,1999 The appellant was arrested.
January 20,1999 Brice Callaway was appointed to represent the appellant.
October 8,1999 The appellant was first indicted.
April 7, 2000 The appellant was arraigned; the appellant pled not guilty by reason of mental disease or defect; and the case was continued to September 11, 2000, for trial.
April 26,2000 The appellant filed a “Motion for Advance Approval of Funds for Independent Mental Health Examination.”
May 19, 2000 The State filed a “Motion for Outpatient Evaluation of Competency to Stand Trial and Mental State at the Time of the Offense.”
May 19,2000 The trial court entered an “Order for Outpatient Evaluation of Competency to Stand Trial and Mental State at the Time of the Offense.”
October 12,2000 The appellant was evaluated at Taylor Hardin Secure Medical Facility.
January 11,2001 The case was scheduled for trial on February 26,2001.
February 15, 2001 The trial court granted the appellant’s motion for a continuance of the tidal and scheduled the trial for April 30, 2001.
February 15, 2001 The trial court granted the appellant’s motion for a continuance on a hearing on a motion in limine and a motion to suppress to March 9, 2001.
March 12, 2001 The appellant filed a motion to suppress and a motion in limine with respect to an inculpatory statement he made to law enforcement officers.
March 14, 2001 The trial court conducted a hearing on the appellant’s motion to *313 suppress his inculpatory statement to law enforcement officers.
March 23, 2001 The trial court granted the appellant’s motion to suppress his incul-patory statement to law enforcement officers.
March 29, 2001 The case was scheduled for trial on April 30,2001.
April 18, 2001 The trial court granted a motion for a continuance of the trial.
July 16,2001 The trial court granted the appellant’s motion for funds for DNA testing:
August 8, 2001 The trial was scheduled for September 10,2001.
August 22,2001 The appellant filed a “Motion for Specific Discovery Regarding DNA Analysis and Motion to Continue.”
August 23, 2001 The trial court granted the appellant’s “Motion for Specific Discovery Regarding DNA Analysis and Motion to Continue.”
August 23,2001 The appellant’filed a motion for production of the victim’s computer or for a hearing with regard to that computer.
September 12, 2001 The trial court granted the appellant’s motion regarding the victim’s computer.
September 24, 2001 The State certified that it had provided to the defense the requested information concerning the State’s DNA analysis in the case.
December 5,2001 The appellant withdrew his insanity defense.
May 3, 2002 The appellant filed a motion for a discovery compliance conference; a motion to dismiss the indictment against him; and a “Motion to Dismiss Prosecution and/or Stay Trial,” requesting a continuance of the trial.
May 9, 2002 The trial court granted the appellant’s motion for a discovery compliance conference; scheduled a hearing for May 13,2002; and scheduled the trial for June 10, 2002.
May 9,2002 The trial court granted the appellant’s motion to dismiss’the indictment against him.
May 10, 2002 The appellant was re-indicted.
May 16, 2002 The trial was scheduled for June 17,2002.
May 20, 2002 The appellant filed a motion to dismiss the May 10,2002, indictment because the grand juiy proceedings were not recorded.
May 28, 2002 The appellant filed a motion for a continuance.
September 20, 2002 The trial court ordered that the district attorney present the case to a grand jury within 60 days for re-indictment and record and transcribe the proceedings for it to conduct an in camera review thereof.
September 27, 2002 The State filed a motion for the circuit judge to recuse from the case.
October 25, 2002 The State filed a motion for the circuit judge to recuse from the case.
November 8, 2002 The State filed a “Motion to Reconsider and to Withdraw Order Requiring Re-Presentation of Case and Recordation of Testimony.”
November 18,2002 The State filed a petition for a writ of prohibition in the Alabama Court of Criminal Appeals, challenging the trial court’s order that the district attorney re-indict the appellant and record and transcribe the grand juiy proceedings, and a petition for a writ of mandamus, seeking to have the trial judge recuse from the case.
November 19, 2002 The trial court entered an order in which it denied the State’s motion to recuse from the case.
November 19, 2002 The Alabama Court of Criminal Appeals stayed further proceedings in the circuit court pending the outcome of the State’s petition for a writ of prohibition.
January 31, 2003 The Alabama Court of Criminal Appeals granted the State’s petition for a writ of prohibition and denied its petition for a writ of mandamus.
February 18, 2003 The trial court and the appellant filed petitions for writs of mandamus in the Alabama Supreme Court, asking it to order the Alabama Court of Criminal Appeals to vacate its order granting the State’s petition for a writ of prohibition.
December 30,2003 The Alabama Supreme Court granted the trial court’s and the appellant’s petitions for writs of mandamus and ordered the Alabama Court of Criminal Appeals to vacate its order granting the *314 State’s petition for a writ of prohibition.
June 25, 2004 On remand from the Alabama Supreme Court, the Alabama Court of Criminal Appeals set aside its decision of January 31, 2003, granting the State’s petition for a writ of prohibition.
July 14, 2004 The trial court ordered that the district attorney re-indict the appellant and record and transcribe the proceedings for it to conduct an in camera review thereof. It also scheduled a hearing for August 16, 2004.
July 20, 2004 The State filed a petition for a writ of prohibition in the Alabama Court of Criminal Appeals, arguing that the trial court did not have the authority to order the district attorney to re-indict the appellant and record and transcribe the proceedings for an in camera review.
August 12, 2004 The State filed a motion for a continuance until the Alabama Court of Criminal Appeals could rale on its petition for a writ of prohibition.
August 12, 2004 The trial court granted the State’s motion for a continuance.
October 8, 2004 The Alabama Court of Criminal Appeals dismissed the State’s petition for a writ of prohibition in which it asked the court to instruct the trial court to set aside its order that the district attorney re-indict the appellant and record and transcribe the grand jury proceedings.
October 22, 2004 The State filed a petition for a writ of prohibition in the Alabama Supreme Court.
December 2, 2004 The Alabama Supreme Court denied the State’s petition for a writ of prohibition.
February 1, 2005 The Attorney General issued an ■ opinion, No. 2005-063, in which he instructed the State Comptroller to stop paying office overhead expenses for attorneys representing indigent criminal defendants.
April 18, 2005 After being notified that Reid Webster was withdrawing as co-counsel for the appellant, the trial court appointed Patrick Tuten as co-counsel for the appellant.
April 22, 2005 Patrick Tuten filed a notice of appearance as counsel for the appellant. He also filed a motion for prior approval of expenses.
May 13, 2005 The appellant was re-indicted.
June 14, 2005 The appellant filed requests for funds to hire a mitigation expert, a forensic pathologist, a statistician, and a specialist to enhance audiotapes.
June 17, 2005 The trial court granted the appellant’s request for funds to hire a mitigation expert, a forensic pathologist, a statistician, and a specialist to enhance audiotapes.
July 2005 The trial court reviewed the grand juiy testimony in camera.
August 9, 2005 Brice Callaway and Patrick Tuten filed motions to withdraw as co-counsel for the appellant based on the Attorney General’s opinion that instructed the State Comptroller to stop paying office overhead expenses for attorneys representing indigent criminal defendants.
November 2,2005 The trial court granted Tuten’s motion to withdraw as co-counsel for the appellant and denied Calla-ivay’s motion to withdraw as co-counsel for the appellant.
November 2, 2005 The trial court appointed Barry Abston as co-counsel for the appellant.
November 2005 Abston filed a motion for approval of overhead expenses.
November 14,2005 The trial court granted Abston’s request for approval of overhead expenses.
November 28,2005 Callaway filed a "Renewed and Supplemented Motion to Withdraw and Request to Reconsider, Amend or Vacate the Order of November 2,2005.”
November 30, 2005 The trial court denied Callaway’s “Renewed and Supplemented Motion to Withdraw and Request to Reconsider, Amend or Vacate the Order of November 2,2005.”
January 6, 2006 The trial court granted Abston’s request for funds to hire a mitigation specialist.
March 2, 2006 The trial court allowed Callaway to withdraw as co-counsel for the appellant; appointed Alan Mann as co-counsel for the appellant; and scheduled the trial for July 24, 2006.
March 14, 2006 Abston filed a “Motion for Order Directing the Clerk of Court to Provide Defense Counsel with a Complete Copy of the Court File, Including All Motions and Orders Filed under Seal.”
*315 March 16, 2006 The trial court granted Abston’s “Motion for Order Directing the Clerk of Court to Provide Defense Counsel with a Complete Copy of the Court File, Including All Motions and Orders Filed under Seal.”
July 10, 2006 The trial court ordered the State Comptroller to pay pre-approved overhead expenses for Abston and Mann.
July 17, 2006 The appellant filed a motion in li-mine to exclude new forensic evidence.
July 17, 2006 The trial court scheduled a hearing on the appellant’s motion to exclude new forensic evidence for July 18, 2006.
July 18, 2006 The trial court conducted a hearing on the appellant’s motion to exclude new forensic evidence.
July 20, 2006 The State filed a motion to continue the trial, which was scheduled to start on July 24, 2006, because the Alabama Department of Forensic Sciences issued a report concerning further DNA analysis in the case during the week of July 10,2006.
July 20, 2006 The appellant filed an objection to the State’s motion to continue the trial.
July 20, 2006 The trial court granted the State’s motion to continue the trial.
July 20, 2006 The appellant filed a motion for independent testing of DNA evidence by a defense expert.
July 21, 2006 The trial court ordered that the defense expert be allowed to perform independent testing of DNA evidence.
July 31, 2006 The trial was scheduled for August 21,2006.
August 16, 2006 The trial court denied the appellant’s motion in limine to exclude new forensic evidence.
August 21, 2006 The trial started.
August 28, 2006 The jury found the appellant guilty of the capital offense of rape-murder.
August 29, 2006 By a vote of 11-1, the jury recommended that the appellant be sentenced to death.
September 14, 2006 The trial court conducted a sentencing hearing and sentenced the appellant to death.
October 13, 2006 The appellant filed motions for a new trial and a judgment of acquittal.
Lynn Morris testified that she was the victim’s mother, that the victim was a nurse who worked from 6 p.m. until 6 a.m., and that the victim ate dinner with her each night before she went to work. The victim telephoned her around 3:30 p.m. on January 2, 1999, and said she was on her way out the door, but she never showed up for dinner and did not return numerous calls. Around 5:00 p.m., Morris drove to the victim’s house, saw the victim’s vehicle in the carport, and entered the house through the kitchen. She saw the items the victim would have carried to work with her scattered about the kitchen floor, heard the victim breathing loudly, and started looking for the victim.
Morris testified that, when she got to the victim’s bedroom, she found the victim lying on the floor. Her pants were down at her ankles, her bra was around her neck and had blood on it, and she had duct tape on her hand. She telephoned her husband and emergency personnel for help. Finálly, Morris testified that the appellant had washed vehicles for her family and for the victim for approximately one year before the victim was murdered.
Lieutenant Jim Wynn of the Huntsville Police Department testified that he responded to the victim’s house between 5:30 p.m. and 6:00 p.m. on January 2, 1999. At that time, the victim was on her back in the bedroom. Her pants and panties were around her knees or ankles; her bra was up over her breasts; she had blood all over her chest; her face was badly beaten; she had duct tape on at least one wrist; and her breathing was very labored. Wynn also testified that it appeared that there had been a struggle in the kitchen and that he believed he was investigating a burglary and a rape.
*316 Kim Heliums testified that she was working as a nurse in the Huntsville Hospital Emergency Room on January 2,1999, when the victim arrived for treatment. Even though she ultimately realized that she knew the victim, the victim’s face was so swollen she was not recognizable. The victim also had duct tape on both hands and a lot of dried blood on her. Heliums testified that, when she examined the victim’s groin area, she saw signs of swelling and bruising around the perineal and vaginal areas and on the inside of her thigh that looked traumatic. She also saw traces of blood and what appeared to be dried semen on the inside of her thigh area. Heliums testified that, in her experience, she had seen that degree of swelling and bruising of the vaginal area only in cases involving sexual assault and that, in her opinion, the victim had been brutally raped.
Investigator Kathy Pierce of the Huntsville Police Department testified that she spoke to the appellant about the murder on January 5, 1999. At that time, the appellant said he had had sexual intercourse with the victim about four months before and that he had last spoken to her about two months before. With regard to the day the victim was murdered, the appellant stated that he worked until about 11:00 a.m.; that he visited with some friends who processed deer until 2:00 p.m. or 2:30 p.m.; that he noticed a police vehicle near the victim’s neighborhood while he and his wife were driving in the area later that day; that he asked his wife if she thought something could be wrong at the victim’s house; that they drove by the victim’s house and then back home; and that, later that night, he saw on television that the victim had been murdered. Afterward, he provided a DNA sample.
Pierce scheduled another interview with the appellant for one week later at 1:00 p.m. on January 12, 1999. However, around 11:00 a.m. on January 12, 1999, the appellant telephoned her, told her he could not come in because his grandmother in Tennessee was having surgery, and said he would return on January 15, 1999. Afterward, Pierce went to the place where the appellant worked. The next day, she went to the house of Chad and Brad Jenkins, the appellant’s friends who processed deer, and she saw a vehicle there that was registered to the appellant’s wife.
On January 15, 1999, Pierce went back to the Jenkins’ house to check the appellant’s alibi for January 2, 1999. When she arrived, she Saw the appellant’s vehicle and confirmed that the appellant had been there but had left. Thereafter, she learned that the appellant’s father lived near the Jenkins’ house, and she and other officers went to that house. Although they could hear the television and a clothes dryer running, no one would answer the door. Ultimately, officers contacted the appellant’s father, who allowed them to enter the house, and they located the appellant completely under the covers of a bed in a back bedroom. Officers arrested the appellant that day.
Cassandra Knight testified that she and the appellant got married on June 1, 1997, and got divorced on September 25, 1999. She also testified that, on January 2, 1999, the appellant came home from work between 4:00 p.m. and 5:00 p.m. and that, while they were out later that evening, they drove by the victim’s house when they saw law enforcement vehicles in her neighborhood. Finally, she testified that she went to Tennessee on January 11, 1999, because her grandmother was having surgery, but stated that the appellant did not go with her.
Chad Jenkins testified that the appellant spent the two nights before he was arrested at his house; that the appellant was *317 gone on the morning of January 15, 1999, when law enforcement officers arrived at the house; and that the appellant’s father lived about one mile from his house. He also testified that he did not remember the appellant helping them process deer during January 1999.
Dr. Stephen Pustilnik testified that he was a medical examiner with the Alabama Department of Forensic Sciences in January 1999; that he performed an autopsy on the victim’s body on January 4, 1999; and that the victim died as a result of multiple sharp and blunt force injuries. The victim had sustained various injuries to her head, neck, left hand, ribs, and rectum as a result of blunt force trauma. An external examination showed that she had also sustained fifteen stab wounds and twelve or fourteen additional abrasions to her chest and abdominal areas. However, an internal examination revealed that she had actually sustained many additional stab wounds. Pustilnik testified that it was his opinion that the victim was stabbed with a flathead screwdriver.
On cross-examination, Pustilnik testified that he saw two lacerations to the victim’s vagina and lacerations in her rectum, but did not see any signs of trauma to her external genitalia. During his testimony, the following also occurred:
“[DEFENSE COUNSEL:] If someone testified that they observed this same person you examined in that report and they said it was among the most dramatic sexual assault things I’d ever seen, would that be consistent with your findings?
“[PUSTILNIK:] Oh, heck no.
“[DEFENSE COUNSEL:] Okay.
“[PUSTILNIK:] No. She had two little lacerations but I wouldn’t call that traumatic.”
(R. 774.) However, on redirect examination, Pustilnik admitted that the victim’s condition was consistent with some sexual assault victims he had seen; that it was possible that lividity had obscured some of the bruising Heliums had observed in the genital area; and that the “lacerations in the rectum [were] an indication of penetrative trauma to the rectum ... suffered at or near the time of her death.” (R. 778-79.) Finally, he testified that he could not state whether the injuries were caused by consensual sexual intercourse or rape.
Rodger Morrison, a forensic scientist employed by the Alabama Department of Forensic Sciences, testified that forensic testing revealed that semen stains from the victim’s thigh and from the carpet from her bedroom matched the appellant’s DNA. He also testified that forensic testing in 1999 revealed that the appellant and Lance Pepper were potential sources of DNA that was found in the victim’s vagina. Finally, he testified newer forensic testing in 2006 eliminated Pepper and included the appellant as a potential source of the DNA that was found in the victim’s vagina.
Dr. Ronald Acton, an expert in DNA analysis, testified for the defense that, based on a review of Morrison’s testing, he agreed with Morrison’s conclusions regarding the semen stain from the victim’s thigh. He also agreed that the DNA on the carpet from the victim’s bedroom was consistent with the appellant’s DNA, but testified that he believed more than one person contributed to the DNA on the carpet. Acton called into question Morrison’s conclusions regarding the DNA that was found in the victim’s vagina. Finally, he stated that a person with Morrison’s training would not be qualified as an expert in the field of DNA analysis according to the criteria under which he worked.
I.
The appellant argues that the trial court erroneously refused to dismiss his *318 case based on a denial of his right to a speedy trial. He first raised an argument regarding the denial of his right to a speedy trial in his post-trial motion for a judgment of acquittal on October 13, 2006. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.; Hamrick v. State, 548 So.2d 652 (Ala.Crim.App.1989) (holding that, absent a timely and sufficient objection at trial, a post-trial motion will not preserve an issue for appellate review).
In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court set forth the following factors that must be weighed when reviewing a speedy trial claim: (1) the length of the delay; (2) the reason for the delay; (3) the accused’s assertion of his right to a speedy trial; and (4) the degree of prejudice the accused suffered due to the delay. In Ex parte Walker, 928 So.2d 259 (Ala.2005), the Alabama Supreme Court provided guidance as to the proper application of those factors.
A. LENGTH OF THE DELAY
Unless the delay is sufficiently lengthy to be presumptively prejudicial, it is not necessary to consider the remaining Barker factors. See Barker, supra; Zumbado v. State, 615 So.2d 1223 (Ala.Crim.App.1993). The length of the delay in this case is measured from the date the appellant was arrested on January 15, 1999, until the date his trial began on August 21, 2006, which was approximately 91 months. This court has previously found that shorter delays than this were presumptively prejudicial and required an examination of the remaining Barker factors. See, e.g., Ex parte Taylor, 720 So.2d 1054 (Ala.Crim. App.1998) (holding that a delay of more than 60 months was presumptively prejudicial); Walker, supra (holding that a 50-month delay was presumptively prejudicial); Vincent v. State, 607 So.2d 1290 (Ala.Crim.App.1992) (holding that a 31-month delay was presumptively prejudicial). Therefore, we will examine the remaining Barker factors.
B. REASONS FOR THE DELAY
In Walker, 928 So.2d at 265, the supreme court set forth the following standard for evaluating the reasons for the delay:
“Barker recognizes three categories of reasons for delay: (1) deliberate delay, (2) negligent delay, and (3) justified delay. 407 U.S. at 531, 92 S.Ct. 2182. Courts assign different weight to different reasons for delay. Deliberate delay is ‘weighted heavily’ against the State. 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101. Deliberate delay includes an ‘attempt to delay the trial in order to hamper the defense’ or ‘ “to gain some tactical advantage over (defendants) or to harass them.” ’ 407 U.S. at 531 & n. 32, 92 S.Ct. 2182 (quoting United States v. Manon, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Negligent delay is weighted less heavily against the State than is deliberate delay. Barker, 407 U.S. at 531, 92 S.Ct. 2182; Ex parte Carrell, 565 So.2d [104,] 108 [ (Ala.1990) ]. Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is not weighted against the State. Barker, 407 U.S. at 531, 92 S.Ct. 2182; Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App. 1993) (‘ “Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.” ’) (quoting McCollum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981)).”
*319 Contrary to the appellant’s allegations in his brief to this court, there is not any indication that the State deliberately or negligently delayed the trial in any way. In fact, during several pre-trial hearings, the State expressed concern about not delaying the trial unnecessarily. Based on the record before us, it appears that very little of the delay was actually attributable to the State. Thus, “we see no deliberate delay by the State to enhance its own case or to prejudice the defense.” Irvin v. State, 940 So.2d 381, 343 (Ala.Crim.App.2005).
Some of the delay in this case was caused by neutral reasons that are not attributable to either the State or the appellant. The investigation was completed, forensic analysis was performed, psychological testing was done, discovery was conducted, and numerous evidentiary matters were resolved. Neutral reasons for delay do not ordinarily require a dismissal of the case based on a violation of the right to a speedy trial. See Pierson v. State, 677 So.2d 830, 831 (Ala.Crim.App.1996).
However, again contrary to the appellant’s assertions in his brief to this court, it appears that the reasons for the delay are primarily attributable to the defense and to the trial court. The record indicates that the appellant specifically requested at least four continuances. Also, although the trial court suppressed an inculpatory statement he made to law enforcement officers in March 2001, the appellant waited more than one year to file a motion to dismiss the indictment against him based on the presentation of that statement to the grand jury. When the trial court dismissed the original indictment on May 9, 2002, the State immediately re-indicted the appellant on May 10, 2002. Thereafter, much of the delay was caused by the appellant’s attorneys continuing to object to the indictment and the trial court insisting that the State re-indict the appellant and record and transcribe the grand jury proceedings. As we noted when we originally granted the State’s petition for a writ of prohibition with regard to this case:
“Judge Hamilton exceeded her jurisdiction by ordering the district attorney to reindict Sharp and to record the proceedings. Although Judge Hamilton had jurisdiction to consider the motion to dismiss, the ground raised in support of the motion was not a legal basis for challenging an indictment. See Rule 13.5, Ala. R.Crim. P.”
State v. Sharp, 893 So.2d 566, 571 (Ala. Crim.App.2003). Thus, the majority of the delay was justified delay that was attributable to the appellant and/or to the trial court, and it weighs heavily against the appellant rather than against the State.
C. THE APPELLANT’S ASSERTION OF RIGHTS
In Walker, 928 So.2d at 265-66, the supreme court set forth the following guidelines for evaluating this prong of the Barker test:
“An accused does not waive the right to a speedy trial simply by failing to assert it. Barker, 407 U.S. at 528, 92 S.Ct. 2182, 33 L.Ed.2d 101. Even so, courts applying the Barker factors are to consider in the weighing process whether and when the accused asserts the right to a speedy trial, 407 U.S. at 528-29, 92 S.Ct. 2182, 33 L.Ed.2d 101, and not every assertion of the right to a speedy trial is weighted equally. Compare Kelley v. State, 568 So.2d 405, 410 (Ala.Crim.App.1990) (‘Repeated requests for a speedy trial weigh heavily in favor of an accused.’), with Clancy v. State, 886 So.2d 166, 172 (Ala.Crim.App.2003) (weighting third factor against an accused who asserted his right to a speedy trial two weeks before trial, and stating:
*320 ‘“The fact that the appellant did not assert his right to a speedy trial sooner ‘tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.’ ” ’) (quoting Benefield v. State, 726 So.2d 286, 291 (Ala.Crim.App.1997), additional citations omitted), and Brown v. State, 892 So.2d 1248, 1254 (Ala.Crim.App.1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial).”
Also, in Irvin, 940 So.2d at 343, we noted:
“Irvin failed to assert his constitutional right to a speedy trial below. The record contains no motion for a speedy trial. In Barker v. Wingo, the Supreme Court recognized, ‘failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial’ 407 U.S. at 532, 92 S.Ct. 2182. Likewise, this Court has held:
“ ‘ “Since there was no effort on the part of the appellant to secure his right to a speedy trial ... he may not complain of any delay on appeal.” Tidmore [v. City of Birmingham], 356 So.2d [231,] 233 [ (Ala.Crim.App.1977) ]. While a defendant who fails to demand a speedy trial does not forever waive his right, this is one factor which must be considered.’
“Bailey v. State, 375 So.2d 519, 523 (Ala. Crim.App.1979). In Turner v. State, 924 So.2d 737, 748 (Ala.Crim.App.2002), this Court recognized that the failure of the defendant to assert his right to a speedy trial weighed against a finding of plain error regarding this claim.”
In this case, the appellant did not file a pre-trial motion for a speedy trial. Rather, he waited until he filed his post-trial motion for a judgment of acquittal to argue that he had been denied his right to a speedy trial. Although the appellant attempts to argue that it is not clear whether he had knowledge of the charges against him, that argument is disingenuous. During discussions regarding his motions to suppress his statement and the indictment against him, the State made it clear that it had presented evidence other than his statement to the grand jury and that it intended to re-indict him for capital murder. Therefore, this factor weighs against the appellant.
D. PREJUDICE TO THE APPELLANT
In Walker, 928 So.2d at 266-67, the supreme court explained:
“Because ‘pretrial delay is often both inevitable and wholly justifiable,’ Doggett, 505 U.S. at 656, 112 S.Ct. 2686, the fourth Barker factor examines whether and to what extent the delay has prejudiced the defendant. Barker, 407 U.S. at 532, 92 S.Ct. 2182. The United States Supreme Court has recognized three types of harm that may result from depriving a defendant of the right to a speedy trial: ‘ “oppressive pretrial incarceration,” “anxiety and concern of the accused,” and “the possibility that the [accused’s] defense will be impaired” by dimming memories and loss of exculpatory evidence.’ Doggett, 505 U.S. at 654, 112 S.Ct. 2686 (quoting Barker, 407 U.S. at 532, 92 S.Ct. 2182, and citing Smith v. Hooey, 393 U.S. 374, 377-79, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966)). ‘Of these forms of prejudice, “the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.’” 505 U.S. at 654, 112 S.Ct. 2686 (quoting Barker, 407 U.S. at 532, 92 S.Ct. 2182).
[[Image here]]
*321 “The United States Supreme Court in Doggett used three hypothetical cases to demonstrate the accused’s burden under the fourth Barker factor. 505 U.S. at 656-57, 112 S.Ct. 2686. See Robinson v. Whitley, 2 F.3d 562, 570 (5th Cir.1998) (discussing Doggett). The accused’s burden ‘of proof in each situation varies inversely with the [StateJ’s degree of culpability for the delay.’ Robinson, 2 F.3d at 570 (citing Doggett, 505 U.S. at 656, 112 S.Ct. 2686). In the first scenario, where the state pursues the accused ‘with reasonable diligence,’ the delay— however long — generally is excused unless the accused demonstrates ‘specific prejudice to his defense.’ Doggett, 505 U.S. at 656, 112 S.Ct. 2686. Thus, when the state acts with reasonable diligence in bringing the defendant to trial, the defendant has the burden of proving prejudice caused by the delay.”
In this case, as set forth above, the State acted with reasonable diligence in bringing the appellant to trial. Therefore, the appellant has the burden of proving that the delay prejudiced him. In his post-trial motion for a judgment of acquittal, the appellant made only the bare allegation that he “was denied his right to a speedy trial.” (C.R. 457.) In his brief to this court, he specifically asserts that he suffered prejudice because he spent six years in jail waiting for a valid indictment and not knowing what charge he would face; because his experienced attorneys withdrew due to the above-referenced attorney general opinion and his new attorneys had less than one year to prepare for the trial; and the State gained an advantage because of advances in DNA testing.
Although the appellant was incarcerated while he was waiting to be re-indicted and tried, as set forth herein, he was well aware that the State intended to charge him with and try him for the capital offense of rape-murder. In fact, the second indictment was returned the day after the trial court dismissed the first indictment. It is true that the appellant’s experienced attorneys withdrew from representing him based on an attorney general opinion regarding the payment of overhead expenses. However, the trial court did not allow both experienced attorneys to withdraw at the same time. And, as set forth more fully in Part IV of this opinion, the appellant’s attorneys filed numerous pretrial motions and were well prepared during both the guilt and penalty phases of the trial. It is also true that there were advances in DNA testing between the time of the offense and the time of his trial. However, although Morrison testified that his testing showed that the appellant was the source of DNA that was found in the victim’s vagina, the defense presented testimony from Acton that he disagreed with Morrison’s conclusions regarding the DNA that was found in the victim’s vagina. Finally, the record does not indicate that his defense was impaired by dimming memories or the loss of exculpatory evidence. Therefore, the record does not establish that the appellant was actually prejudiced by the delay in this case.
Moreover, even if we were to conclude that the appellant was entitled to a presumption of prejudice due to the sheer length of the delay, the majority of that delay was caused by his own actions, as set forth above. Also, there is not any indication that the delay actually hampered his defense in any way. See Walker, supra.
After weighing the Barker factors, the record before us does not support a finding that the appellant was denied his right to a speedy trial. Accordingly, we do not find that there was any error, much less plain error, in this regard.
*322 II.
The appellant also argues that the State did not present sufficient evidence to support his conviction. Specifically, he contends that the State did not establish that he engaged in sexual intercourse with the victim by forcible compulsion.
At the time of the offense, § 13A-6-61(a), Ala.Code 1975, provided, in pertinent part:
“A male commits the crime of rape in the first degree if:
“(1) He engages in sexual intercourse with a female by forcible compulsion .... ”
“Forcible compulsion” is defined as “[p]hysical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person.” § 13A-6-60(8), Ala. Code 1975.
“In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala. Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error.- Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.”
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
“ ‘In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’ Fairdoth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Fairdoth, [471] So.2d 493 (Ala.1985).
[[Image here]]
“1 “The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.” Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). ... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). “[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.” Fuller v. State, 269 Ala. 312, *323 383, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).’ Granger [v. State], 473 So.2d [1137,] 1139 [ (Ala.Crim.App.1985) ].
“... ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985).”
White v. State, 546 So.2d 1014, 1017 (Ala. Crim.App.1989). Also,
“ ‘[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala.1979).’
“Ward, 610 So.2d at 1191-92.”
Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997).
Based on the evidence that there was a struggle in the victim’s home, the location and condition of the victim’s body and clothes when her mother found her, the semen stains on the victim’s thigh and carpet that were consistent with the appellant’s DNA, Heliums’ observations of the victim’s genital area shortly before her death, the numerous wounds to the victim’s body, the lacerations to the victim’s vagina and rectum, and Pustilnik’s testimony regarding the possible effects of liv-idity on the victim’s genital area, there was sufficient circumstantial evidence from which the jury could have reasonably concluded that the appellant engaged in sexual intercourse with the victim by forcible compulsion. Furthermore, “[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury.” Smith v. State, 698 So.2d 189, 214 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997). Therefore, the appellant’s argument is without merit.
III.
The appellant further argues that the trial court erroneously denied his request that the jury be polled after it recommended a sentence of death during the penalty phase of his trial. After the penalty phase deliberations, the following occurred:
“THE COURT: All right. Has the jury reached a verdict?
“FOREPERSON: Yes, Your Honor, we have.
“THE COURT: Okay. [R.P.], would you read the verdict, please?
“FOREPERSON: Yes, ma'am. In the Circuit Court of Madison County, Alabama, sentencing verdict, We, the *324 Jury, determine that the appropriate sentence for Jason Michael Sharp is death. Number of jurors voting in favor of the death penalty, eleven. Number of jurors opposed to the death penalty, one.
“THE COURT: All right. Anything further from the defendant at this time?
“MR. MANN: Judge, we’ll have to ask that the jury be polled.
“THE COURT: The law is that their individual votes cannot be disclosed. Let me do this. Let me ask the foreperson, can you certify under your oath as a juror, [R.P.], that as foreperson of this jury eleven members of your panel voted in favor of the death penalty?
“FOREPERSON: Yes, Your Honor.
“THE COURT: And one voted against it?
“FOREPERSON: Yes, Your Honor.
“THE COURT: Okay. Anything further?
“MR. MANN: No, Your Honor.”
(R. 1190-91.) At that point, the appellant did not object to the method by which the trial court dealt with his request that the jury be polled. Rather, he waited until he filed his motion for a new trial to argue that the trial court did not poll the jury. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.; Hamrick v. State, 548 So.2d 652 (Ala.Crim.App.1989) (holding that, absent a timely and sufficient objection at trial, a post-trial motion will not preserve an issue for appellate review).
With regard to polling of jurors, Rule 23.5, Ala. R.Crim. P., provides:
“After the verdict is returned and before the jury is discharged, the jury shall be polled at the request of any party or may be polled upon the court’s own initiative. The poll shall be conducted by the court or by the clerk of the court, each juror being asked individually whether the verdict announced is that juror’s verdict. If upon the poll there is not unanimous concurrence, the court shall direct the jury to retire for further deliberation.”
Although Rule 23, Ala. R.Crim. P., applies to verdicts and addresses various types of verdicts, it does not specifically reference advisory verdicts in capital cases. Also, Rule 23.1(a), Ala. R.Crim. P., provides that “[t]he verdict of the jury shall be unanimous,” and Rule 23.5, Ala. R.Crim. P., refers to “unanimous concurrence.” However, advisory verdicts in capital cases are not required to be unanimous. See § 13A-5-46(f), Ala. Code 1975. Finally, it would not be appropriate to require individual jurors in capital cases to indicate whether they voted to recommend a sentence of imprisonment for life without the possibility of parole or death. Therefore, we question whether Rule 23.5, Ala. R.Crim. P., applies to advisory verdicts in capital trials.
Moreover, in McNair v. State, 653 So.2d 320, 342 (Ala.Crim.App.1992), a capital case in which the death penalty was imposed, we addressed a similar situation as follows:
“At the sentence phase of the trial, the jury’s vote of 10-2 was recorded and verified by the foreperson of the jury as the correct vote. The sentence recommendation verdict of the jury complied with § 13A-5-46(f), and there was no error in the trial court’s refusal to poll each member of the jury following the verdict in the penalty phase of the trial. The trial court, in response to the appellant’s motion to poll each juror, did ask the jury whether anyone disagreed that the 10-2 vote returned was the actual vote.”
In this case, although it did not poll the jurors individually, the trial court did ask the foreperson to certify that eleven jurors *325 voted in favor of the death penalty and one juror voted in favor of imprisonment for life without the possibility of parole. None of the jurors expressed any disagreement with the foreperson’s representations, and the defense did not request any further inquiry by the trial court. Accordingly, we do not find that there was any error, much less plain error, in this regard.
IV.
The appellant additionally argues that “the trial court erred by permitting the withdrawal of [his] original court-appointed attorneys when the governmental intrusion into the attorney-client relationship denied payment of overhead expenses to said attorneys, thus depriving [him] of his fundamental right to counsel.” (Appellant’s brief at p. 28.) However, he did not raise such an objection until he filed his motion for a new trial. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.; Hamrick v. State, 548 So.2d 652 (Ala.Crim.App.1989) (holding that, absent a timely and sufficient objection at trial, a post-trial motion will not preserve an issue for appellate review).
Before the trial started, Mann and Ab-ston, the attorneys who represented the appellant at trial, filed motions for a jury questionnaire; for cautionary instructions regarding bloody photographs of the victim and the crime scene; to compel disclosure of aggravating circumstances and information relating to mitigating circumstances; to require the State to give notice of its intent to introduce other acts evidence; for disclosure of impeaching information; for a transcript of the grand jury proceedings, the exhibits and other documentation of the grand jury proceedings, and a list of the members of the grand jury; to disclose past and present relationships, ties, and associations between members of the district attorney’s office and prospective jurors; to order the State Comptroller to pay pre-approved overhead expenses; to reveal the identity of any informants and any deals, promises, or inducements made to them; to allow the appellant to view the crime scene with them; for production of negatives for all photographs taken by State agents; for production of the victim’s computer or a showing as to why the computer is not available; for pre-approval of expenses for a change of venue expert and a DNA expert; for discovery with respect to DNA evidence; in limine regarding witness statements; and for transcripts of previous witness testimony. During the guilt phase of the trial, the appellant’s attorneys extensively cross-examined the State’s witnesses, including the State’s DNA expert, and presented a DNA expert who called into question the validity of some of the findings of the State’s DNA expert. During the penalty phase of the trial, the appellant’s attorneys called the appellant’s stepmother and sister, a licensed clinical social worker, and a licensed psychologist to testify about his upbringing and how it affected him. Finally, the arguments and objections the appellant’s attorneys made indicate that they were well acquainted with the facts and evidence and had thoroughly prepared for the trial.
In this case, although the trial court allowed the attorneys who had represented the appellant for some time to withdraw and appointed new attorneys to represent him, it did not allow both experienced attorneys to withdraw at the same time. In fact, Callaway remained as counsel for approximately four months after Abston was appointed to represent the appellant. Also, the trial court appointed a new attorney to represent the appellant at the same time it allowed a previous attorney to withdraw. Further, the trial court granted *326 Abston’s “Motion for Order Directing the Clerk of Court to Provide Defense Counsel with a Complete Copy of the Court File, Including All Motions and Orders Filed under Seal.” Finally, Abston and Mann did not request a continuance or otherwise indicate that they had not had time to prepare for the trial. Rather, they filed numerous pre-trial motions, requested and obtained funds to retain several experts, and were well prepared for trial, as set forth above. The record before us simply does not support a finding that the appellant was deprived of his right to counsel. Therefore, we do not find that there was any plain error in this regard.
V.
Finally, the appellant argues that the trial court did not properly consider the mitigating circumstance that he was under the influence of extreme mental or emotional disturbance at the time of the offense. See § 13A-5-51(2), Ala.Code 1975. Because we must remand this case for the trial court to amend its sentencing order, as explained in Part VI of this opinion, we pretermit discussion of this argument at this time.
VI.
Based on our review of the record, we conclude that the trial court’s written sentencing order does not comply with the requirements of § 13A-5-47(d), Ala.Code 1975, which provides, in pertinent part:
“Based upon the evidence presented at trial, the evidence presented diming the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursur ant to Section 13A-5-52.”
In its sentencing order, the trial court did not make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975,[1] and the existence or nonexistence of each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975.[2]
Therefore, we remand this case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala.Code 1975. If necessary, the trial court may reweigh the aggravating circumstances and the mitigating circumstances and re-sentence the appellant. On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time *327 and within 42 days after the release of this opinion.
REMANDED WITH INSTRUCTIONS.
McMILLAN, SHAW, WISE, and WELCH, JJ., concur.

On Return to Remand

BASCHAB, Presiding Judge.
On August 29, 2008, we remanded this case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Aa. Code 1975. On remand, the trial court complied with our instructions. We now address the remaining issue the appellant raises and the propriety of his conviction and sentence of death.
I.
The appellant argues that the trial court did not properly consider the mitigating circumstance that he was under the influence of extreme mental or emotional disturbance at the time of the offense. Specifically, he appears to contend that the trial court did not give due consideration to expert testimony about “the extreme mental disturbance that [he] was under due to the abuse he suffered as a child.” (Appellant’s brief at p. 33.) Because he raises this argument for the first time on appeal, we review it for plain error. See Rule 45A, Aa. R.App. P.
“The [trial] court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance,” Calhoun v. State, 932 So.2d 923, 975 (Aa. Crim.App.2005), even if that evidence is from an expert.
“ ‘[A] factfinder is not bound by expert testimony “even if all of the witnesses are presented by only one side.” ’ Ellis v. State, 570 So.2d 744, 752 (Aa.Cr.App. 1990). ‘In Aabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted.’ Jefferson County v. Sulzby, 468 So.2d 112, 116 (Aa.1985). ‘An expert’s opinion, however, is not conclusive on the trial court, even though uncontroverted. See Kroger Co. v. Millsap, 280 Aa. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues.’ Williams v. City of Northport, 557 So.2d 1272, 1273 (Aa.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). ‘Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.’ Harrell v. State, 470 So.2d 1303, 1308 (Aa.Cr.App.1984), affirmed, 470 So.2d 1309 (Aa.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).”
Carroll v. State, 599 So.2d 1253, 1272 (Aa. Crim.App.1992). “‘While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’ Bankhead v. State, 585 So.2d 97, 108 (Aa.Cr.App.1989).” Ex parte Slaton, 680 So.2d 909, 924 (Aa.1996). Finally, although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance. See Williams v. State, 710 So.2d 1276 (Aa. Crim.App.1996), aff'd, 710 So.2d 1350 (Aa. 1997).
Regarding the mitigating circumstance set forth in § 13A-5-51(2), Aa.Code 1975, the trial court stated:
*328 “In regard to the mitigating circumstance enumerated in Section 13A-5-51(2), the Defendant did not present any evidence of this mitigating circumstance, nor did the court find any evidence to show that this mitigating circumstance existed in this case.”
(Order on remand.) However, it also stated that it considered as nonstatutory mitigating evidence
“all aspects of the Defendant’s character and record. Specifically, the Court considered the Defendant’s childhood, including but not limited to his stepmother’s and his sister’s testimony that at a very young age he and both of his siblings were essentially abandoned by his mother and that he was abused and neglected by his mother and her various boyfriends and husbands. The Defendant also witnessed his mother being abused by these boyfriends and husbands.”
(C.R. 449.) These excerpts show that the trial court complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in considering evidence about abuse the appellant suffered as a child. The trial court was not required to find the existence of the statutory mitigating circumstance that the appellant was under the influence of extreme mental or emotional disturbance at the time of the offense. Therefore, we do not find that there was any error, much less plain error, in this regard.
II.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant’s conviction and sentence of death. The appellant was indicted for and convicted of capital murder because he committed the murder during the course of a rape or an attempted rape. See § 13A-5-40(a)(3), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved the existence of two aggravating circumstances: 1) the appellant committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a rape, see § 13A-5-49(4), Ala.Code 1975, and 2) the offense was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found that there were two statutory mitigating circumstances — 1) the appellant did not have a significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975, and 2) the appellant’s age at the time of the crime, see § 13A-5-51(7), Ala.Code 1975. With regard to nonstatutory mitigating circumstances, the trial court made the following findings:
“The Court has considered all aspects of the Defendant’s character and record. Specifically, the Court has considered the Defendant’s childhood, including but not limited to his stepmother’s and his sister’s testimony that at a very young age he and both of his siblings were essentially abandoned by his mother and that he was abused and neglected by his mother and her various boyfriends and husbands. The Defendant also witnessed his mother being abused by these boyfriends and husbands. In addition, the Court considered the fact that the Defendant was married at the time that the offense was committed and had a two-year old daughter.”
*329 (C.R. 449.) The sentencing order shows that the trial court weighed the aggravating circumstances and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A.-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant’s sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed the murder during the course of a rape. Similar crimes are being punished by death throughout this state. See Lewis v. State, 889 So.2d 623 (Ala. Crim.App.2003); Williams v. State, 795 So.2d 753 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant’s substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant’s conviction and sentence of death.
AFFIRMED.
McMILLAN, SHAW, WISE, and WELCH, JJ., concur.

. In its order, the trial court found that there were two aggravating circumstances — 1) the appellant committed the offense while he was engaged in the commission of a first-degree rape, see § 13A-5-49(4), Ala.Code 1975, and 2) the offense was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. Rather than making specific findings as to the existence or nonexistence of each of the remaining aggravating circumstances, the trial court simply stated that the State did not allege or prove any of the other statutory aggravating circumstances.

. In its order, the trial court found that there were two statutory mitigating circumstances — 1) the appellant did not have a significant history of prior criminal activity, see § 13A—5—51(1), Ala.Code 1975, and 2) the appellant’s age at the time of the crime, see § 13A-5-51(7), Ala.Code 1975. However, it’ did not address the existence or nonexistence of the statutory mitigating circumstances set forth in § 13A-5-5R2), (3), (4), (5), and (6), Ala.Code 1975.